IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOEY B. GRAVES, SR. | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 8:20-cv-03302-PX |
| THE NATURE CONSERVANCY | * | |
| Defendant. | * | |

***

## MEMORANDUM OPINION

Plaintiff Joey B. Graves, Sr. brings this action against his former employer, Defendant The Nature Conservancy, alleging unlawful employment discrimination and retaliation on account of his race. ECF No. 1. Pending before the Court is The Nature Conservancy's motion for summary judgment. ECF No. 35. Finding no hearing necessary, *see* D. Md. Loc. R. 105.6, and for the following reasons, the motion is GRANTED.

**I.    Background**[1]

On October 21, 2013, Joey B. Graves, Sr. ("Graves"), an African American man, began working for The Nature Conservancy ("TNC") as a Senior Payroll Specialist. ECF No. 36-4 at 2; *see also* ECF No. 36-2 at 5. TNC is a "global conservation organization" that operates throughout the United States and in 71 other countries. ECF No. 35-3 ¶ 1. Graves worked in TNC's Payroll Department with one other employee, Joyce Sherrod ("Sherrod"), an African American woman. *See* ECF No. 35-4 ¶ 5; ECF No. 36-3 at 14. Until 2019, both Graves and Sherrod reported to Payroll Manager Garry Jones ("Jones"), an African American man. *Id.* ¶ 4; ECF No. 36-2 at 6.

---

[1] Except where otherwise noted, the following facts are undisputed and construed most favorably to Graves as the non-movant. *See News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 364 n.3 (D. Md. 2011).

### A. Graves' Tenure Under Jones

As the Senior Payroll Specialist, Graves' duties included processing payroll, data entry, and responding to email queries from TNC employees about payroll administration. *See* ECF No. 36-2 at 7. Generally, Jones considered Graves a competent employee with a keen understanding of payroll functions and a knack for training Sherrod on core aspects of her position. *See, e.g.*, ECF No. 36-24 at 2 ("You have done a good job training [Sherrod] . . . ."); *id.* at 4 ("I am very pleased with the progress that you have made with taking over the Payroll processing on Monday and Tuesday."); ECF No. 36-25 at 2 ("[T]here were some processes that you have started and a few new duties that you have accomplished with good results."); *id.* at 5 ("I feel that you know most of the general Payroll laws, and if you don't know[,] you know where to find the answers.").

But Graves' work ethic, from the beginning, had been less than stellar. Within the first six months at TNC, Jones memorialized "some concerns with [Graves'] punctuality." ECF No. 36-28 at 2. Similarly, Graves' 2015 performance evaluation reflected that he "consistently" arrived to work late, spent excessive time taking personal phone calls while in the office, and failed to respond to email queries in a timely fashion. *See* ECF No. 36-24 at 4. According to Jones, these were "major concern[s]," necessitating substantial improvement on Graves' part. *See id.*

In 2016, Graves' problems with punctuality and time management persisted. By July of that year, Jones expressed concerns about Graves' having left his desk on "[two] different occasions for over 45 minutes." ECF No. 36-29 at 2. Jones further noted that when he confronted Graves about his absence, Graves began "yelling and cursing," with an overall

attitude of "insubordination." *Id.* Jones, once again, reminded Graves about the need for punctuality and urged that he refrain from handling personal matters at work. *See id.*

Graves and Jones also butted heads about remote work options for the Payroll Department. Although TNC did not have a uniform remote work policy, Jones agreed to offer the Payroll Department this option on a trial basis starting in January 2019. *See* ECF No. 36-2 at 15–16. In short order, Jones decided against adopting a formal remote work policy, but he advised Graves and Sherrod that they could seek permission when the need to work from home arose, such as if "the furnace man is coming to fix your furnace today . . . ." *Id.* at 19–20. Thereafter, Jones always granted Graves' remote work requests. *Id.* at 20 ("I do not recall ever asking [Jones] can I work from home today and he said no.").

### B. Merger of Payroll and Benefits Departments

In 2019, TNC underwent a major reorganization. Pertinent to this case, the Payroll and Benefits Departments merged;[2] Jones' position was eliminated; and an outside candidate, Nichole Barta ("Barta"), a white woman, was hired as the new department manager. *See* ECF No. 35-4 ¶ 6; ECF No. 36-3 at 5–6. According to TNC's Managing Director of Global Human Resources, Rebecca Brake, Barta was brought on to be a "change agent." ECF No. 36-30 at 5. Thus, TNC expected that Barta would reconfigure the new department so that it functioned under one set of rules and processes. *See* ECF No. 36-2 at 114.

Barta viewed the former Payroll Department as suffering from a lack of structure as to when and how payroll tasks must be completed. *See* ECF No. 36-3 at 19–20. Barta, in turn, implemented a series of formal checklists and timelines applicable to payroll employees, including Graves. *See, e.g., id.* at 20 & 30.

---

[2] The Benefits Department had five employees, four white women and one African American woman. *See* ECF No. 35-4 ¶ 5; ECF No. 36-3 at 14–15.

Barta also reallocated certain tasks that Jones had been performing between Graves and Sherrod. *See* ECF No. 36-5 at 16. To accomplish this, Barta held a series of meetings with Graves and Sherrod aimed at clarifying "who does what and who is responsible" for related work. ECF No. 36-3 at 21. During one such meeting, Graves volunteered to handle all email queries. *See* ECF No. 36-2 at 33–34 ("So yes, I gladly accepted taking on emails."); *see also* ECF No. 36-3 at 21–22 ("And [Graves'] responsibility was to answer all of the questions coming into the payroll mailbox. And it is something that he was excited and volunteered to do as part of one of those meetings that we had together."). Barta additionally tasked Graves with responsibility for "global payroll," which required Graves to update tax records for TNC employees working abroad. ECF No. 36-2 at 35–36. Graves estimates that every year, global payroll consumed "a weekend and several days" of his time. *Id.* at 37. Last, Graves was expected to perform certain "tax updates" to a payroll-related database about "four to five times per year." *See* ECF No. 45-1 ¶ 26. Although Graves generally asserts that these additional duties meant he assumed "80%" of Jones' workload (ECF No. 45 at 1), nothing else in the record supports this estimate. Likewise, nothing suggests that Graves' compensation, title, or other benefits changed once he took on these tasks.

### C. New Remote Work Policy

As part of the departments' merger, Barta also had to reconcile two very different remote work policies. Whereas the former Payroll Department permitted only occasional work from home, the Benefits Department allowed regular remote work on preset days of the week. *Compare* ECF No. 36-2 at 22 (explaining that the Benefits Department had long been permitted to work from home) *with id.* at 16 (explaining that the Payroll Department did not have a remote working policy because Jones "didn't believe in working from home"). When Barta first took

over in July 2019, she assured Graves and Sherrod that she would "put a [remote work] plan together" after she made "changes related to how processes are done." ECF No. 36-3 at 25. The remote work plan went into effect four months later, in November 2019. *Id.* at 24. In the interim, Barta allowed the two to work from home on an as-needed basis and never denied such a request. *See id.* at 26 ("I never denied a work from home request. A permanent work from home solution required more planning, and we did that planning in early fall."); ECF No. 36-2 at 89 (Graves agreeing that there was no "discernable difference in the work from home approach" used by Jones and Barta).

### D. Graves' Difficulties with Barta

As head of the newly formed Payroll and Benefits Department, Barta vowed to give her employees direct performance feedback. She held weekly department meetings where each person was expected to "talk about what they are working on, what is going well[,] and what they could use help on." ECF No. 36-5 at 16 & 19. Barta also expected her direct reports to submit what she called "2x2 Forms," in which she worked with the employee to list two areas where the employee was performing well and two areas that required improvement. *See, e.g.*, ECF No. 36-17.

Under this new review system, Barta noticed similar deficiencies in Graves' work ethic that Jones had observed. *See, e.g.*, ECF No. 36-16. For instance, by October of 2019, Barta directed Graves to respond to email queries within 72 hours and provide related "status updates." *Id.* at 2. Barta also warned Graves that his payroll deliverables were often late and recommended that he "set a goal and adjust [his] workflow to process payroll" by the scheduled deadlines. ECF No. 36-17 at 2. And as of November 25, 2019, Barta admonished Graves for failing to create paysheets on time or otherwise ask for help completing this task; failing to keep Barta

updated on his progress related to other projects; and not replying to multiple work-related emails from Barta. *See* ECF No. 36-18 at 2–3. Before long, Barta routinely received complaints that Graves was not timely responding to email queries. *Id.* at 3.

To Barta, Graves' performance problems had been apparent "[f]rom the moment [she] arrived at TNC." ECF No. 35-4 ¶ 13; *see also* ECF No. 36-3 at 66 ("As soon as I first started with TNC, the complaints were starting to come in."). And so, while other employees within the Payroll and Benefits Department also struggled with completing certain tasks in a timely manner,[3] Graves' shortcomings caused her the greatest concern. ECF No. 36-3 at 65 ("Their performance challenges did rise to the same level. They did not have other performance issues like [Graves] did."); *id.* (noting "consistent complaints about [Graves'] customer service" and Graves' habit of "consistently missing deadlines").

When Graves' performance did not improve, Barta began collaborating with TNC's Human Resources Business Partner, Felicia Green ("Green"), to find a solution. ECF No. 35-4 ¶¶ 3 & 15. Green, an African American woman, first advised Barta to document formally her concerns about Graves' performance. *Id.* Green next suggested implementing a written performance improvement plan ("PIP"). *Id.* ¶ 20. As Green explains, PIPs "are meant to help a struggling employee better understand their responsibilities and help them achieve them." *Id.* ¶ 29.

During the same time, Graves began complaining to Green that Barta had taken too long to announce a remote work policy. *See* ECF No. 35-4 ¶ 16; ECF No. 36-2 at 110. Graves also did not like that Barta at first implemented the remote work policy "on a 'trial' basis" only for

---

[3] For example, Barta reprimanded one employee for "timeliness when it comes to deliverables and replying to customers" (ECF No. 36-3 at 19), she brought to another's attention the "complaints from the Payroll Team . . . [about her] not putting in her entries and slowing them down" (ECF No. 36-3 at 33), and she verbally coached a third about arriving on time to team meetings (ECF No. 36-3 at 47–48).

the former Payroll Department employees, whereas the former Benefits Department employees—most of whom were white—had been allowed to keep their previous remote work policy.  ECF No. 35-4 ¶ 16.

At Green's suggestion, Graves filed and "Ethics and Compliance" complaint against Barta in November 2019, which prompted an internal investigation.[4]  See ECF No. 36-2 at 110; ECF No. 35-4 ¶¶ 16 & 18.  During the investigation, Graves voiced concern that he was "treated differently on the basis of race" when it came to the remote working policy and his increased responsibilities.  See ECF No. 36-5 at 13–14.  He also alleged that Barta had given him negative performance reviews in retaliation for his having complained about the remote work policy.  See id.  The investigation concluded in March of 2020, and the investigator issued a written report that deemed Graves' complaints unsubstantiated.  See id. at 12–25.

### E.  The Performance Improvement Plan

Although Green and Barta had agreed that Graves should be placed on a PIP, TNC customarily delayed action on PIPs during the pendency of Ethics and Compliance investigations.  Accordingly, once the investigation was over, Barta and Green moved forward with the PIP for Graves.  See ECF No. 35-4 ¶¶ 20–22, 28.

The PIP evaluation period lasted from April 24, 2020, until June 30, 2020.  ECF No. 36-1; see also ECF No. 35-4 ¶ 28.  Under the PIP, Graves was to arrive promptly for all scheduled meetings, provide weekly updates to Barta about the status of email queries, abide by all departmental deadlines, and improve his interpersonal communications with Barta and other TNC colleagues.  See generally ECF No. 36-1.

---

[4] The record reflects that Graves did not specifically allege racial discrimination until a conversation with Green in November 2019.  See ECF No. 35-4 ¶ 16.  It was this allegation that prompted Green to recommend that Graves "escalate[] his complaints" to TNC's Ethics and Compliance Department.  See id.

A month into the PIP, Barta and Green met with Graves to discuss how his performance had "ebbed and flowed." ECF No. 35-4 ¶ 30. Although Graves initially appeared "on-track" to successfully complete the PIP, his progress was short-lived. *Id.* Graves stopped responding to Barta's emails and failed to complete "the easiest tasks on his PIP." *Id.* For his part, Graves wrote to Barta and Green to explain that he did not know if he would be able to complete the PIP and his existing payroll duties unless he was given "a little extra time." ECF No. 36-31 at 2. Graves readily concedes that satisfying the conditions of the PIP was not his top priority. *See* ECF No. 45 at 6; *see also* ECF No. 36-2 at 51–52.

### F. Graves' Separation from TNC

At the conclusion of the PIP, Barta and Green agreed that Graves' performance had not improved. ECF No. 35-4 ¶ 33. Accordingly, they issued Graves a "final written warning," in which he was told that he would be given another "stripped down, easier version of the PIP" that was "obviously achievable." *Id.* ¶ 34. They explained that if he did not successfully complete that "stripped down" PIP, he would be terminated. *See* ECF No. 36-32. Barta and Green alternatively offered that Graves could enter into a separation agreement in which he would voluntarily resign and receive 10 weeks' severance totaling nearly $16,000. *See* ECF No. 36-3 at 51; ECF No. 36-44.

Graves refused to work under the stripped down PIP but did not want the severance package either. Instead, Graves stopped reporting to work and now asserts he was "terminated." *Compare* ECF No. 36-2 at 60 ("The next week, I was terminated.") *with* ECF No. 36-3 at 49 ("Mr. Graves was not terminated . . . ."). Barta replaced Graves with Sherrod and hired Jonah Hunter Gray, an African American woman, to fill Sherrod's position. ECF No. 36-3 at 75 & 77.

On November 13, 2020, Graves filed suit against TNC, alleging race discrimination and

8

retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). *See* generally ECF No. 1. TNC timely answered the Complaint (ECF No. 6), and after protracted discovery, TNC moved for summary judgment in its favor on all claims (ECF No. 35). For the following reasons, the motion must be granted.

## II.     Standard of Review

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). "[A] court is not entitled to either weigh the evidence or make credibility determinations" at the summary judgment stage. *In re French*, 499 F.3d 345, 352 (4th Cir. 2007). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)) (alteration in original). Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

### III. Analysis

Graves pursues his claims under both Title VII and Section 1981. Each statute prohibits discrimination and retaliation on the basis of race, and the elements for each statutory liability theory are the same. *See Bowling v. Humanim, Inc.*, No. JKB-16-3298, 2017 WL 713862, at *2 (D. Md. Feb. 22, 2017) ("In the employment context, courts analyze claims of racial discrimination brought under § 1981 according to the same requirements as those brought under Title VII of the Civil Rights Act of 1964.") (citing *Gairola v. Va. Dept. of Gen. Serv.*, 753 F.2d 1281, 1285 (4th Cir. 1985)). Thus, the Court analyzes the Title VII and Section 1981 claims together, starting with the discrimination allegations.

### A. Discrimination

An employer may not discriminate against "any individual with respect to [his] compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551–52 (4th Cir. 2006). To pursue such a claim, a plaintiff may either present direct evidence of discrimination or invoke the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Bowling*, 2017 WL 713862, at *2; *Macedo v. Elrich*, No. 20-3006-PX, 2021 WL 4391124, at *5 (D. Md. Sept. 24, 2021); *Sillah v. Burwell*, 244 F. Supp. 3d 499, 511 (D. Md. 2017).

Graves proceeds under *McDonnell Douglas*. Accordingly, he must first make a *prima facie* showing that (1) he belonged to a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated employees who were not a member of his protected class received more favorable treatment. *See White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). If Graves makes that showing, the burden shifts

to TNC to assert a legitimate, nondiscriminatory reason for its conduct. *McDonnell Douglas Corp.*, 411 U.S. at 802. If TNC so demonstrates, then the burden shifts back to Graves to show that TNC's stated rationale is pretext for discrimination. *See Foster v. Summer Vill. Cmty. Ass'n, Inc.*, 520 F. Supp. 3d 734, 742 (D. Md. 2021) (citing *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001)).

As to the *prima facie* case, TNC principally argues that Graves has adduced no evidence that he suffered adverse employment actions.[5] *See* ECF No. 35-2 at 25. To rebut TNC's argument, Graves must have experienced more than a "trivial discomfort[] endemic to employment." *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999). That is, some evidence must reflect that TNC acted against him in a manner that affected the "terms, conditions, or benefits" of his employment. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 866 (4th Cir. 2001)).

Graves maintains that TNC took four separate actions against him, each sufficiently "adverse" to sustain his claims: (1) delaying implementation of a permanent remote work schedule until November 2019; (2) assigning him additional duties without any additional benefits or compensation; (3) imposing a PIP without cause; and (4) effectively terminating him by conditioning his future employment on agreeing to a stripped down PIP or resigning with a severance package. ECF No. 45 at 1, 6, 15–16. The first three actions are not sufficiently "adverse" to sustain the claims.

On the first, "denial of a telework arrangement on its own does not constitute an adverse employment action." *Redmon v. United States Capitol Police*, 80 F. Supp. 3d 79, 87 (D.D.C.

---

[5] The Court assumes, without deciding, that Graves has satisfied the remaining elements of the *prima facie* case. *See Burdine*, 450 U.S. at 253 ("The burden of establishing a prima facie case of disparate treatment is not onerous.").

2015) (citing cases); *see also Brockman v. Snow*, 217 F. App'x 201, 206 (4th Cir. 2007) (unpublished) ("A determination affecting [the plaintiff's] ability to work where she chooses is not the type of ultimate decision that this court has required for a prima facie case of discrimination."). This is especially so when the claimed "denial" was no more than a short delay in formalizing a remote work policy during which time Graves was never actually denied the benefit of working from home. *See* ECF No. 36-2 at 89; ECF No. 36-3 at 26.

As to Graves' contention that he took on "80%" of his former supervisor's duties (ECF No. 45 at 1), no evidence supports that claim. Although additional duties can constitute adverse employment actions when they are "so weighty as effectively to change [the] basic terms of employment," *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 599 (D. Md. 2011), no rational factfinder could conclude that this was Graves' fate. Rather, he was given two recurring tasks which occupied only several work days out of the year. *See* ECF No. 36-2 at 37; ECF No. 45-1 ¶ 26. Thus, viewing the record most favorably to Graves, taking on these discrete tasks without additional compensation cannot constitute a legally adverse employment action.

Nor does the initial PIP constitute an adverse employment action. *See Jensen-Graf v. Chesapeake Employers' Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015) (unpublished). This is especially so where, as here, the PIP did not trigger any denial of any benefits, prevent a job promotion, or visit any other adverse consequence. *Id.; see also Cottman v. Rubin*, 35 F. App'x 53, 55 (4th Cir. 2002) (unpublished) (holding that placement on a PIP does "not amount to [a] redressable adverse employment action[]"). Rather, the record amply reflects that Graves' chronic non-responsiveness, difficulty with punctuality, and other well-documented shortcomings prompted the PIP.

His last theory of relief fares slightly better.  Viewing the record most favorably to Graves, TNC's ultimatum to either take the stripped down PIP or enter TNC's severance agreement left Graves no choice but to leave the organization.  *See* ECF No. 36-32 at 2.  Although the record does amply support that the stripped down PIP had been prompted by Graves' continued poor performance, the Court concludes that if Graves' claims survive at all, it is on the theory that TNC's take-it-or-leave-it approach amounts to a constructive discharge.

On this point, TNC argues that even if the claim could proceed on this basis, the company has offered a legitimate, non-discriminatory reason for placing Graves on the stripped down PIP; namely, the documented history of Graves' "persistent failure" to meet Barta's legitimate job expectations both before and during the initial PIP.  *See* ECF No. 35-2 at 36 ("Graves had a documented history of persistent failure to meet his supervisor's expectations."); *see also Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) ("[The employer's] burden, however, is a burden of production, not persuasion.").  The Court agrees.  Thus, for the claim to survive challenge, Graves must adduce some evidence that the stated reasons for his stripped down, take-it-or-leave it PIP was pretextual.

In this regard, Graves argues that Barta treated him more harshly because she "simply favored white women."  *See* ECF No. 45 at 14.  Graves contends that because no white women coworkers were "placed on a PIP or pressured to resign or terminated," this alone gives rise to an inference of pretext.  *Id.* at 7.  Graves misses the mark.  The record reflects that Barta had disciplined several of her direct reports, Black and white alike, without suggestion that such actions were motivated by race.  *See* ECF No. 36-3 at 19, 33, 47–48; *see also* ECF No. 35-4 ¶ 42.  To be sure, none of them were placed on a PIP, but that is because none of them had exhibited the same persistent difficulties with punctuality and completing tasks that Graves did.

*See* ECF No. 36-3 at 65.  Last, any allegation that Barta favored white employees over African Americans is undermined by Barta having replaced Graves with Sherrod, an African American woman, and hiring another African American woman to fill Sherrod's position.

Graves next argues that an inference of pretext is warranted because the Ethics and Compliance investigation concluded that Graves had committed no wrongdoing, and that the PIP was wholly unfounded.  *See* ECF No. 45 at 10–11.  As to the Ethics and Compliance investigation, its purpose had been to investigate Graves' allegations of race discrimination, and on this, the report found them all unsubstantiated.  The investigation did not, however, exonerate Graves of anything.  At most, the report recognized the tense relationship between Graves and Barta as emblematic of the lack of trust between the two (ECF No. 36-5 at 19), but this alone does not give rise to a reasonable inference of pretext.

As for the PIP, Graves argues, with little support, that it had been unfairly forced on him. *See* ECF No. 45 at 7.  But the robust employment record, dating back to his first months on the job, amply demonstrates the contrary.  *See, e.g.*, ECF Nos. 36-1, 36-16, 36-17, 36-18, 36-24, 36-25, 36-26, 36-28, 36-38.  Graves' chronic lack of punctuality, unresponsiveness, and refusal to prioritize the initial PIP's requirements provided cause for either requiring he perform the stripped down PIP or end his employment.  Indeed, even Graves himself concedes that Barta "had grounds" for at least some of her criticisms.  *See* ECF No. 36-2 at 72–73.  By contrast, no evidence undermines the legitimacy of TNC's efforts to improve Graves' performance or cut ties.  Thus, because no evidence supports the rational inference that TNC's actions were pretext for race discrimination, TNC's motion for summary judgment on these claims must be granted.

### B. Retaliation

Just as an employer may not discriminate on the basis of race, it cannot take any retaliatory action against an employee who avails himself of the statutory protections from such discrimination. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *see also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015). To make a *prima facie* showing of retaliation, Graves must adduce some evidence that: (1) he engaged in protected activity by either participating in a Title VII proceeding or opposing his employer's discriminatory practices; (2) the employer took a materially adverse action against him; and (3) a causal connection exists between the two. *Perkins*, 936 F.3d at 213.

TNC does not contest that Graves engaged in protected activity, and the Court has already explained that a genuinely disputed fact exists on whether TNC constructively discharged Graves. *See* ECF No. 35-2 at 38; *see also supra* Part III.A. Accordingly, Graves must generate some evidence that a causal connection existed between his protected activity and his alleged termination. As to this, Graves appears to rely solely on the temporal proximity between his human resources complaints and his alleged termination. *See Sempowich*, 19 F.4th at 654; *see also Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) ("[T]emporal proximity between a complaint and an adverse employment action can, *in some cases*, be used to survive summary judgment . . . .") (emphasis added).

Graves lodged his complaints of racial discrimination in November 2019 but was not terminated until July 2020, some eight months later. No other facts tie the claimed adverse action to his human resources complaints. Thus, given the substantial "passage of time," no rational trier of fact could conclude that Graves had been effectively terminated because he complained. *See Pascual v. Lowe's Home Centers, Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006)

Case 8:20-cv-03302-PX Document 54 Filed 08/05/22 Page 16 of 16

(unpublished) ("Generally speaking, however, the passage of time alone cannot provide proof of causation unless the 'temporal proximity between an employer's knowledge of protected activity and an adverse employment action' was 'very close.'") (quoting *Clark County Sch. Dist. V. Breeden*, 532 U.S. 268, 273 (2001) (per curiam)). Without more, summary judgment must be granted in TNC's favor on the retaliation claims.[6]

### IV. Conclusion

For the foregoing reasons, the motion for summary judgment (ECF No. 35) filed by Defendant The Nature Conservancy is GRANTED. A separate Order follows.

August 5, 2022                                                            /s/
Date                                                                      Paula Xinis
                                                                          United States District Judge

---

[6] Graves also seems to suggest that his being "singled out for the PIP" constitutes a materially adverse action prompted by his protected activity. ECF No. at 16. Even if the PIP were somehow construed as adverse, the record indisputably shows that Green and Barta began discussing Graves' mounting performance issues well before Graves complained to Green about racial discrimination. *Compare* ECF No. 35-4 ¶ 15 *with id.* ¶ 16. Further, the PIP had been postponed only because TNC maintained a policy against implementing PIPs during the pendency of internal investigations. *See* ECF No. 35-4 ¶ 22. Thus, viewing the record most favorably to Graves, no rational trier of fact could conclude that the PIP was implemented as payback for Graves having lodged a discrimination complaint.